# In the United States Court of Federal Claims

No. 20-123C
Filed: May 26, 2023

```
* * * * * * * * * * * * * * * * *
                                 *
AMERICAN GROUND               *
TRANSPORTATION, INC.          *
                                 *
       and                       *
                                 *
LIBERTY LAUNCH, INC.,         *
                                 *
              Plaintiffs,     *
                                 *
       v.                        *
                                 *
UNITED STATES,                *
                                 *
              Defendant.      *
                                 *
* * * * * * * * * * * * * * * * *
```

*Maryann Cazzell*, Cazzell & Associates, California, for plaintiffs.

*Joshua A. Mandlebaum*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., for defendant.

## OPINION

**FUTEY**, Senior Judge.

This case concerns a concession contract formerly held by plaintiffs to provide shuttle services on a military base. Plaintiffs' complaint alleges that the United States violated this contract and breached the duty of good faith and fair dealing when the government permitted competitors to operate on base and to commit various torts against plaintiffs. Plaintiffs also maintain that the United States' actions constitute intentional interference with prospective economic relations, negligent interference with prospective economic relations, and ordinary negligence. Plaintiffs seek damages for all these alleged harms, subject to proof as to amount.

Currently before the Court is the government's motion to dismiss the case.

Also pending is plaintiffs' motion to strike one of the government's exhibits.[1]

The matter is now ripe for disposition.

I. **BACKGROUND**

   a. **Factual Background**

Plaintiffs American Ground Transportation (American Ground) and its subcontractor Liberty Launch, Inc. (Liberty) (together plaintiffs or the Concessionaires) held a concession contract to provide base-wide shuttle service at Camp Pendleton, CA (the Base). The Marine Corps Community Services (the Agency), a nonappropriated fund instrumentality of the United States, awarded this contract on December 13, 2010, after a competitive bidding process. Second Amend. Compl. (Compl.), ECF No. 38, ¶ 21. The contract was to last for five years, with the Agency holding the unilateral option to extend for up to five additional one-year terms. Ex. 1 to Def.'s Mot. (Contract), ECF No. 39-1, at 1, 19. Plaintiffs replaced the previous concessionaire, SeaBreeze, after a period with no contractor. Compl. ¶ 28. At the conclusion of the contract term, on December 31, 2015, the Agency notified plaintiffs that it would not renew and would not award any concession contract for these services in the future. Letter, Ex. 3 to Def.'s Mot., ECF No. 39-2. The Agency, however, extended the contract until January 24, 2016, to give the Concessionaires time to discontinue operations and leave the Base. *Id.*

Under the terms of the contract, the Agency agreed to "provide the operational space to [American Ground] that is empty and without trade fixtures or furniture," to assist with "marketing and advertising" at plaintiffs' expense, and to coordinate with them about routes, hours of operation, and similar logistics. Contract at 1, 10. In consideration, the Concessionaires paid a monthly commission on sales and a monthly fee for the upkeep of each "location in shopping centers, parking lots, etc. assigned and occupied as a fixed management or operations site." *Id.* at 6, 9, 19. "In the event office or operational building spaces are provided," the Concessionaires had additional repair obligations. *Id.* at 18.

The contract also contained a provision in Attachment A, labeled "Non-Exclusivity Contract." *Id.* at 47; *see also id.* at 1 (incorporating Attachment A into the contract). This provision declares that that "[u]nless specified elsewhere, this contract does not establish Contractor as the sole supplier of goods or services to be

---

[1] As discussed below, plaintiffs originally titled this document "objections to evidence" but has since described it as a motion to strike. *See* Pls.' Mot. To Strike (Pls.' Mot.), ECF No. 50, at 1; Pls.' Reply on Mot. To Strike (Pls.' Reply), ECF No. 53, at 1.

provided on this military installation."[2]  Two merger clauses also appear in the contract, stating that the written provisions and five attachments together "constitute the entire agreement" between the government and the Concessionaires. *Id.* at 19–20.  Both parties concede that the contract is fully integrated.  *See* Def.'s Reply, ECF No. 41, at 8; Pls.' Mot., at 4.

During the five years of the Concessionaires' incumbency, SeaBreeze---along with other shuttle services---continued to operate on base and used the same pick-up and drop-off locations as the Concessionaires.  *See* Compl. ¶¶ 28–29.  Neither party alleges that SeaBreeze is an agent of the United States.

On June 13, 2017, the Concessionaires were banned from the Base via a separate disciplinary process.  They also lost their RapidGate passes at that time. *See* Compl. ¶ 41; Pls.' Opp'n, ECF No. 40, at 33.

### b. Procedural Background

After exhausting administrative remedies, the Concessionaires filed a complaint in the United States District Court for the Southern District of California on March 21, 2019.  Compl. ¶¶ 4, 42–43.  On October 15, 2019, the district partially dismissed the case and transferred the remaining portion to this Court.  ECF No. 21.  While a motion to dismiss the case was pending, the Concessionaires moved for leave to file a Second Amended Complaint, and that motion was granted.  ECF Nos. 33–35.  The government moved to dismiss the case, the Concessionaires responded, and the government replied in support of its motion.  ECF Nos. 39–41.

The Second Amended Complaint alleges that the United States breached its agreement by allowing SeaBreeze to operate on base during the Concessionaires' incumbency.  It also maintains that SeaBreeze committed multiple torts against plaintiffs, and that the Agency further breached the contract by not preventing those third-party torts.  The complaint also alleges that the Agency violated the implied duty of good faith and fair dealing through its actions.  *Id.* ¶¶ 54–57.

The earlier Transfer Complaint, in comparison, suggested that the Agency also breached an implied-in-fact contract that existed after the explicit contract

---

[2] At first, the parties presented differing version of Attachment A.  *Compare* Contract *with* Ex. A to Pls.' Status Report, ECF No. 44 (Pls.' Attach. A).  In plaintiffs' version, the non-exclusivity provision starts with a prefatory clause ("Unless specified elsewhere") that is not in the government's variant.  *See* Pls' Attach. A at 4.  On the Court's request, the government clarified that the prefatory clause was not in the original Request for Proposals (RFP) but was added to Attachment A in the final contract.  Def.'s Supp. Br., ECF No. 49, at 16–17.  The government admits, then, that plaintiffs are correct and that this prefatory language is in the contract.

ended. *See* Transfer Compl., ECF No. 27, ¶ 28. This argument does not appear in the Second Amended Complaint, but the Concessionaires' opposition to the motion to dismiss develops the same theory. The Concessionaires allege that the Agency allowed continued performance as if under the contract even though the Agency neither renewed nor insisted upon payment of the monthly commissions. *See generally* Pls.' Opp'n at 28–33.

The government maintains that the contract did not provide for exclusivity, Def.'s Mot. at 14–16, that SeaBreeze's alleged torts cannot be attributed to the Agency, *id.* at 17–19, and that the United States is therefore not liable for these torts. As for the implied-in-fact contract, the United States maintains that there was no continued performance as under the contract. *See* Def.'s Reply at 11–13. Finally, the government points out that the implied duty of good faith and fair dealing cannot create new obligations and must be keyed to the promises in the contract. Because the Concessionaires cannot point to specific promises that were allegedly undermined, says the government, it cannot plausibly allege a breach of the duty. Def.'s Mot. at 22–24.

On August 21, 2021, defendant filed a supplemental brief in support of its motion to dismiss. Def.'s Supp. Br., ECF No. 49. To this brief, the government attached a Declaration of Richard A. Scott. Scott Dec., Ex. 1 to Def.'s Supp. Br., ECF No. 49-1. A week later, plaintiffs filed document entitled "Objections to Evidence," challenging the Scott Declaration on various admissibility grounds, including the personal knowledge requirement, the authentication requirement, and the best evidence rule. Pl.'s Mot. at 1, 3, 10–11, 13; *see also* FED. R. EVID. 602, 901, 1002. The Court has construed this document as a motion to strike portions of the Scott Declaration. Order, ECF No. 51. Plaintiffs themselves now refer to that filing as "motion to strike" that was previously "filed as 'objections to evidence'." Pls.' Reply, at 1.

## II.     DISCUSSION

### a. Legal Standards

#### i. Subject Matter Jurisdiction, RCFC 12(b)(1)

Under the Rules of the United States Court of Federal Claims (RCFC), this Court must dismiss claims that do not fall within its subject-matter jurisdiction. RCFC 12(b)(1). When considering a motion to dismiss a case for lack of subject-matter jurisdiction, the Court generally accepts all factual allegations by the non-movant and draws all reasonable inferences in the light most favorable to that party. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *Pixton v. B&B Plastics, Inc.,* 291 F.3d 1324, 1326 (Fed. Cir. 2002) (stating that on a motion to dismiss for lack of subject-matter jurisdiction courts view "the alleged facts in the complaint as true, and if the facts reveal any reasonable basis upon which the non-movant may

prevail, dismissal is inappropriate"); *CBY Design Builders v. United States,* 105 Fed. Cl. 303, 325 (2012).

### ii. Failure to State a Claim, RCFC 12(b)(6)

Cases that fall within the Court's jurisdiction must still be dismissed if they fail to state a claim on which the Court can grant relief. *See* RCFC 12(b)(6). Notably, "[w]hen considering a motion to dismiss a case for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a court accepts all well-pled facts as true and draws all reasonable inferences in plaintiff's favor." *Silver Buckle Mines, Inc. v. United States*, 117 Fed. Cl. 786, 791 (2014) (citing *Scheuer*, 416 U.S. at 236; *Pixton*, 291 F.3d at 1326; *Englewood Terrace Ltd. P'ship v. United States,* 61 Fed. Cl. 583, 584 (2004)). Granting a motion to dismiss a case for failure to state a claim "is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). Denial of the motion is warranted when the complaint presents "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

Because contract interpretation is question of law, not of fact, the Court may interpret a contract on a motion to dismiss and need not accept the non-moving party's claims as to its meaning. *See Varilease Tech. Grp., Inc. v. United States*, 289 F.3d 796, 798 (Fed. Cir. 2002); *Fin. & Realty Servs., LLC v. United States*, 128 Fed. Cl. 770, 777 (2016).

### iii. Motion to Strike, RCFC 12(f)(2)

This Court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." RCFC 12(f). "[C]ourts view motions to strike with disfavor and rarely grant them. A motion to strike must be directed to a 'pleading,' which term has been construed narrowly by the courts. Other court documents may not be attacked by a motion to strike." *Fisherman's Harvest, Inc. v. United States*, 74 Fed. Cl. 681, 690 (2006) (citations omitted); *see also Info. Scis. Corp. v. United States*, 86 Fed. Cl. 269, 276 n. 1 (2009). Furthermore, "it has been the practice of the United States Court of Federal Claims to decline to grant a motion to strike, where the moving party is unable to show prejudice or confusion." *Id.* at 276 n. 1 (citations omitted).

### b. Analysis

#### i. Plaintiffs' Breach of Contract Claim

Plaintiffs maintain that the Agency breached the contract by permitting other shuttle services to operate on base. Undoubtedly, the contract disclaimed exclusivity. Contract at 47. Nevertheless, plaintiffs contend that the contract

- 5 -

offered a partial form of exclusivity---enough to obligate the Agency to stop SeaBreeze from competing in the manner it did.  *See* Pls' Opp'n, ECF No. 40, at 10–14.

First, the Concessionaires maintain that, without some level of exclusivity, the contract lacks consideration.  *Id.* at 13–14.  Supposedly, without exclusivity, the Agency offered nothing and gave nothing in exchange for the concession payments.  *Id.* at 14.  Thus, the Court should interpret the contract in a manner that will make it valid by reading exclusivity into it.  *Id.*

Next, the Concessionaires contend that the contract as a whole is ambiguous.  Moreover, the Concessionaires argue that the non-exclusive clause is itself ambiguous, when read in light of provisions elsewhere in the contract.  *Id.* at 23 (stressing that the non-exclusivity clause starts with "Unless specified elsewhere").  Thus, the clause should be interpreted against the drafter and in favor of the contractor, American Ground.  *Id.* at 21–22.

Finally, the Concessionaires locate exclusivity in the language of the Request for Proposals (RFP).  *See id.* at 23–24.  Contrary to the government's claims, discussed below, plaintiffs maintain that the RFP was incorporated into the contract.  *Id.* at 23; *see also* Contract at 1 (incorporating Attachment E---the RFP---into the contract).

Responding to the government's argument that some of the alleged breaches took place after the contract expired, Def.'s Mot. at 21, the Concessionaires counter that they held an implied-in-fact contract at that time.  Pl.'s Opp'n at 28–29; *see also Trauma Serv. Group v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1995) (setting forth the elements of an implied-in-fact contract with the United States).

The Concessionaires point to a conversation between American Ground's President and the Agency's authorized representative Steven Garbutt, in which the latter represented that the Concessionaires could continue to operate at Camp Pendleton as if under the contract.  Pls.' Opp'n at 28–29.  According to plaintiffs, this representation was an implied exercise of the government's option to extend the contract by a year.  *See* Contract at 19.  In support of this argument, plaintiffs highlight the government's June 13, 2017 order purporting to terminate the agreement.  *Id.* at 32.  If no agreement still existed in 2017, why did the government need to issue an order ending an agreement?  Similarly, plaintiffs note that they possessed RapidGate passes until that date.  *Id.* at 33.

Additionally, the Concessionaires argue that the Agency was obligated, at least on base, to enforce California law regarding shuttlebuses, taxicabs, and motor vehicles.  *See* Pl.'s Supp. Br., ECF No. 45, at 17.  The failure to do so, the Concessionaires insist, is a breach.  *Id.*  To this end, they cite Attachment D of the contract describing the Provost Marshal's law enforcement authority.  *See id.* at 19.

This provision states that civilians not subject to the Uniform Code of Military Justice may be tried in the appropriate district court for offenses on base. *Id.*; *see also* Contract at 74. Plaintiffs reason that, given the Provost Marshal's authority to enforce California law and the Concessionaires' inability to do so, the Agency was obligated to enforce these laws against SeaBreeze, yet failed and refused to do so. Pl.'s Supp. Br. at 19. Plaintiffs also point to contractual provisions requiring them to use licensed drivers. *Id.* at 11.

The government argues that the Concessionaires were promised nothing beyond what they received. Chiefly, the argument rests on the non-exclusivity clause, which the government portrays as unambiguous. *See* Def.'s Mot., ECF No. 39, at 14; Def.'s Reply at 2. Because the contract is fully integrated, parole evidence is inadmissible as regards unambiguous terms. Nothing in the contract establishes exclusivity, so plaintiffs were not promised any. Even without exclusivity, the contract contained ample consideration: coordination with the Agency and an on-base presence. *Id.* at 4.

Turning to the non-exclusivity provision, the government maintains that the Concessionaires have not identified a second reasonable interpretation and hence cannot show the clause to be ambiguous. *Id.* at 2. Next, the government argues both that the RFP is irrelevant because it was not incorporated into the contract and that it does not establish exclusivity regardless. Def.'s Mot. at 15.

The government also denies that certain allegations can be breaches because they occurred after the contract lapsed. According to the government, plaintiffs mischaracterize these events. Def.'s Reply at 12. The 2017 Order did not terminate a contract. Rather, it banned Liberty from the Base. And the ban came from the Air Force Disciplinary Control Board, not the Agency at all. *Id.*

Finally, the government notes that the Concessionaires' state law argument cites no legal authorities. Federal government contracts are governed by federal law. Def.'s Supp. Br. at 3. And federal contracts do not impliedly force the government to obey any state laws nor incorporate any state legal requirements. *Id.* at 4–5 (citing *Agredano v. United States*, 595 F.3d 1278, 1281 (Fed. Cir. 2010))

Plaintiffs do not allege a plausible claim for breach of contract. Because the Court cannot detect exclusivity in this contract and the contract did not make any promises about third-party torts, the breach of contract claim must be dismissed.

The consideration for this contract was clear---space, advertising at cost, and coordination with the Agency. *See generally* Contract at 9; *see also* Def.'s Reply at 4 (listing the benefits that both parties admit plaintiffs received). The Concessionaires, however, believe that these benefits are inadequate. But consideration only requires the loss of a legal right or the gain of a legal burden: not any specific quantity. *See Ridge Runner Forestry v. Veneman*, 287 F.3d 1058, 1061

(Fed. Circ. 2002); *Nebco & Assocs. v. United States*, 23 Cl. Ct. 635, 645 (1991). Parties decide for themselves what consideration is sufficient. If bargained for, a mere peppercorn satisfies. *Nat'l Air Cargo Grp., Inc. v. United States*, 126 Fed. Cl. 281, 296 (2016). It is irrelevant that the Concessionaires now assert that they would not have entered the contract without more consideration. What matter is whether, objectively, the parties mutually assented to the deal. *See Lamle v. Mattel, Inc.*, 394 F.3d 1355, 1359 (Fed. Circ. 2005). Secret hopes and wishes count for nothing. *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814–15 (7th Cir. 1987) (Easterbrook, J.)

The primary problem with the Concessionaires' breach of contract claim is that, at bottom, all their allegations amount to an assertion of exclusivity. *See* Compl. ¶¶ 19, 21, 27, 30, 31, 32, 34, 55. But the contract disclaimed exclusivity "[u]nless otherwise specified." Contract at 9. Although the Concessionaires assert that the contract otherwise specified through various provisions of the RFP, the Court is not convinced.

The Concessionaires come closest to persuading on the issue of the operational space. Compl. ¶¶ 30, 31, 34, 55. The contract required the Agency to "provide the operational space to [American Ground] that is empty and without trade fixtures or furniture." Contract at 10. The contract never defines what "the operational space" is, but the direct article and use of the singular indicates that a specific site was envisioned. According to the Concessionaires, both parties understood at formation that "the operational space" referred to a designated loading zone in one parking lot in Area 52 on the Base. Pls.' Supp. Br. at 20, 24; Pls.' Opp'n at 15. Plaintiffs argue that the clause obliged the Agency to prevent other shuttle services from picking up passengers from this location. The operational space would not be "empty"---empty that is of rival companies' vehicles.

The Court will assume that "the operational space" referred to this loading zone (although the government contests this, claiming the phrase denoted an office). Plaintiffs' interpretation fits with the provision, elsewhere in the contract, requiring them to pay upkeep for each "location in . . . parking lots, etc. assigned and occupied as a fixed management or operations site." Contract at 6. And the Agency evidently had discretion to supply plaintiffs with an office if it chose, but "the operational space" was mandatory. *See id.* at 18 (setting plaintiffs' extra duties "[i]n the event office or operational building spaces are provided"). Thus, plaintiffs' construal of the phrase "the operational space" is reasonable---indeed, more reasonable than the government's alternative.

Nonetheless, the operational space provision cannot mean that the Area 52 loading zone had to remain empty of competing vehicles. *Contra* Pls.' Opp'n at 15–16. Plaintiffs themselves concede that rival shuttle services such as SeaBreeze were allowed to drop off passengers in this zone. *See* Pls.' Supp. Br. at 20; Pl.'s 2d. Supp. Br. at 12, ECF No. 59. They assert, however, that after a drop-off, rivals

could not reload their vehicles in this zone.  No matter why vehicles entered the zone, the operational space would not be "empty" of them.

Moreover, the space provision modifies the word "empty" with the phrase "without fixtures or furniture."  Under the immediate context canon, an ambiguous term receives more precise content from the neighboring words associated with it—the companions it keeps.  *See United States v. Stevens*, 559 U.S. 460, 474 (2010); *Bank of America v. United States*, 964 F.3d 1099, 1104 (Fed. Circ. 2020); ANTONIN SCALIA & BRYAN E. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 204–05 (2012) (discussing possible meanings of general term followed by specifics).  "Empty," thus, means free of fixtures and other furnishings.  Competing shuttlebuses are not fixtures and are not captured within "empty."

A contrary reading would be untenable.  Does empty mean the loading zone must be free of passengers, free of luggage, free of drop-offs?  Of course not.  Just as clearly, it does not mean free of competitors.  To maintain that "empty" means free of competing vehicles---but of nothing else---is indefensible.  The operational space provision unambiguously cannot support the reading that plaintiffs give it.

As for the RFP provisions, the Court agrees with plaintiffs that these provisions were incorporated into the contract.  *See* Contract at 1 ("This Contract consists of the provisions herein, and . . . Attachment 'E' RFP").  But the Court agrees with the government that none of these RFP provisions helps plaintiffs, as stated below.

Section 3002 pledged that the contract would be awarded to the responsible offeror whose application is the "most advantageous" to the Agency.  Compl. Ex. B at 21.  Although the Concessionaires do not elaborate, presumably this supposedly promises exclusivity because it is in the singular.

Section 3003 provides the procedures by which an incumbent contractor will turn over to a new contractor.  *See also* Contract at 18.  Admittedly, change-over provisions often appear in exclusive concession contracts.  But there was a clear explanation why this non-exclusive contract needed such a provision.  The contract guaranteed the Concessionaires a presence on base---including the operational space---and assured the Base that scheduled shuttles would run.  It is reasonable that, at the time of the solicitation, the Agency would have wanted to maintain this presence continuously and minimize service disruption during the transition.

Section 4000(b) required a competitive bid and stated that only a single concession agreement would be awarded.  Compl. Ex. B at 22.  Section 4001 explained that the Agency wanted to "expand the services currently provided" by its then-contractor.  *Id.*  It described the Base and the nature of the transportation needs.  *Id.*  Plaintiffs do not enlarge upon why these sections imply exclusivity.  Section 4002 called for a high-quality, professionally operated shuttle service.  *Id.* at

22–23.  Presumably, this supports exclusivity because it is phrased in the singular. Plaintiffs do not elaborate.

For the most part, the Concessionaires do not explain why these RFP provisions support exclusivity, neither in the complaint nor in the briefing.  It is, for the most part, simply declared.  *See, e.g.*, Pls.' Opp'n at 23 (saying "[a]nd boy, was it specified elsewhere!" then citing the RFP sections discussed above).

Nor does the Court detect ambiguity.  *See Park Village Apartments v. United States*, 25 Cl. Ct. 729, 732 (1992) (unambiguous contract terms govern over unilateral expectations).  The phrasing of the non-exclusivity provisions is as clear as possible.  And the Concessionaires have not produced a plausible alternative reading.  *See Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999) (requiring that a party show it reasonably relied at formation on an alternate interpretation of the wording).  The Concessionaires have not demonstrated that the "unless" language, discussed above, is helpful to them.  Nor is the entire contract ambiguous through contradiction, as the Concessionaires claim.  The Concessionaires have not pointed to anything in the contract creating a contradiction.

As to the rest, the Concessionaires unpersuasively claim they have the right to operate exclusively.  Pls.' Opp'n at 10, 14, 16; *see also* Compl. ¶ 21.  Plaintiffs say, correctly, that they could operate without interference.  But then they stretch interference to mean competition.  Plaintiffs cannot turn a right of non-interference into a right to exclusivity expressly disclaimed in the contract's plain language.  *See Ala. Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993) ("Where contract provisions are clear and unambiguous, they must be given their plain and ordinary meaning.") (citation omitted).

One portion of the contract is confusing.  The contract states that, if new routes or locations are established, the Agency may, at its discretion, give American Ground "the first right of refusal for the location[s]."  Contract at 5.  If American Ground declines, the Agency can offer this location or locations to a different contractor.  *Id.*  Given that the contract is non-exclusive, it is not obvious what this means.  If an additional location is set up, what is the value of offering it first (at the government's discretion) to the Concessionaires, when others can then serve the same route and pick up in the same location anyway?  At first glance, this clause seems to presume that routes or locations can be held by one shuttle operator versus another.

But the Court is not convinced that this oddity is enough to render the contract provisions relating to exclusivity ambiguous.  The right of refusal provision, although awkwardly drafted, fits when read alongside other sections in the contract.  As discussed, the Agency is obligated to "provide the operational space . . . empty and without trade fixtures or furniture."  Contract at 10.  The

Concessionaires, moreover, must pay upkeep for each "location in shopping centers, parking lots, etc. assigned and occupied as a fixed management or operations site." *Id.* at 6. And the two parties together must coordinate about various "exterior and interior signs," posted to inform potential customers about fare rates, schedules, and so forth. *Id.* at 6, 9. Presumably, exterior signs would be trade fixtures.

Evidently, then, the contract anticipated that the Agency might create extra loading zones beyond the Area 52 zone discussed above. The Agency had the discretion to offer these new loading zones to plaintiffs. And, if plaintiffs accepted the Agency would have to keep the new zones empty of trade fixtures (e.g., a rival shuttle company's signage), just like the original "operational space." If plaintiffs declined, though, the Agency could give a rival company its own operational space with its own coordinated signage and fixtures. The right of first refusal is discretionary, but the Agency cannot abuse this discretion by failing to grant the right in bad faith. *See Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005) (noting that every contract imposes an implied duty of good faith and fair dealing in its performance and enforcement); *Dobyns v. United States*, 915 F.3d 733, 739–40 (Fed. Cir. 2019) (stressing that that breaches of the duty must connect to specific contractual provisions). Implicitly, the right of refusal provision requires the Agency to consider in good faith offering the location to American Ground first, before it fills a new location with a rival company. Properly understood, this provision is consistent with the non-exclusivity of the contract.

As for the implied-in-fact contract claims, the Court concludes that the Concessionaires never formed an implied-in-fact contract after expiration of their express contract. An implied-in-fact contract "must be 'founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *Trauma Servs. Group v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997) (quoting *Hercules Inc. v. United States*, 516 U.S. 417, 424 (1996)). Only an "authorized agent of the Government" may enter into an implied-in-fact contract binding the government. *Id.* After expiration of an express contract, continued performance "under the contract's terms" generally establishes an implied-in-fact contract. *Seven Resorts, Inc. v. United States*, 112 Fed. Cl. 745, 780 (2013).

Here, on the Concessionaires' own facts, performance did not continue on the contract's terms. All that the Concessionaires allege is that they still served Marines on base---exactly what they claim SeaBreeze did during the period of the express contract. And the Concessionaires admits that they stopped paying commissions---again, just like SeaBreeze. Compl. ¶ 38. As discussed, the Agency's choice to permit SeaBreeze to pick up and drop off on base did not breach the contract. So too, the Court holds, the Concessionaires' post-expiration operations were not continued performance. It was just another illustration of what bus companies may do without a contract.

Plaintiffs have not alleged all the elements of an implied-in-fact contract. First, this supposed contract would fail for want of consideration to the government. *See Stanwyck v. United States*, 127 Fed. Cl. 308, 312–13 (2016) (listing the elements of an implied-in-fact contract). The Concessionaires allege that they no longer paid anything and that they were allowed (but not required) to pick up passengers on base. This supposed implied contract, thus, was illusory. The Concessionaires promised to benefit the government only if and when they wanted to.

Moreover, plaintiffs rely heavily on the 2017 order banning them from the Base. "Why else," ask the Concessionaires, "would the United States issue an Order purporting to terminate that agreement as of June 13, 2017?" Pls.' Opp'n at 32. But plaintiffs describe this order as issued by the Agency and the Armed Forces Disciplinary Control Board together. Compl. ¶ 41. The latter entity would not be involved in the termination of a shuttlebus contract. It would be if, for disciplinary reasons, a company were banned from the Base. Thus, these allegations do not show that a contract existed. At most, they show that a contract was breached---if other allegations supported an implied-in-fact contract. A company can be banned from the Base without having an underlying concession contract to terminate.

The same is true for the saga of the RapidGate passes. Pls.' Opp'n at 32–33; Contract at 79. The Concessionaires were contractually obligated to secure RapidGate passes. But keeping those passes until the summer of 2017 does not mean that the contract remained in effect until then. Many people who do business on base have passes. The business/vendor category is broad. It includes, for instance, insurance salesmen, house cleaners, and pizza delivery trucks. Attachment D, ¶ 3(f)(2)(b)(8)–(9). If pizza boys have RapidGate passes, it is unsurprising that non-contracted shuttlebus drivers have them too.

Consider that, once the Concessionaires' contract expired, the Agency decided not to have a new contractor. By plaintiffs' logic, the consequence should have been no shuttle drivers with RapidGate passes. People on base without passes are defined as visitors. Contract ¶ 3(f)(2)(e). A business without a pass may only enter the Base three times within a 45-day window. *Id* at 3(f)(3)(f). This, of course, would make shuttlebus operations impossible. So, it is not the rule. Shuttlebus drivers may obtain RapidGate passes because passes are not limited to contractors. This same error repeats when the Concessionaires argue that the government should have taken away SeaBreeze's passes when its contract ended. Pl.'s Supp. Br. at 22. RapidGate passes are not just for contractors.

Because the Concessionaires have not alleged sufficient facts to establish plausibly that performance continued after the expiration of the contract on the contract's terms or on any terms, the Court holds that they have not alleged an implied-in-fact contract. All claims resting on facts occurring after the expiration of the express contract must be dismissed.

Finally, on the state law argument, the Court agrees with defendant that government contracts typically do not incorporate any law, federal or state, unless they do so on their face.  *See St. Christopher Assocs. v. United States*, 511 F.3d 1376, 1384 (Fed. Cir. 2008); *Smithson v. United States*, 847 F.2d 791, 794 (Fed. Cir. 1988). But even if state law was incorporated by implication so that the government had to obey, on threat of breach, the Concessionaires would need something more.  They need a contractual obligation on the part of the Agency to enforce state law against its competitors.  That term cannot be read into any contract by implication: certainly not into a government contract.  The obligation to obey the law is not an affirmative duty to enforce the law.

The contractual language which the Concessionaires cites falls far short of obligating the government to enforce any law against third parties.  *See* Contract at 10–11.  The language requires "the Contractor"---that is, American Ground---to maintain California licenses.  SeaBreeze and other competitors are not contractors, and the contract never hints that it obligates the government to ensure that third parties follow any state laws.

Turning to the law enforcement power provisions, Attachment D pertains to "Applicable Base Pass and Regulations."  *See* Contract at 74.  It deals with the regulations that the Concessionaires must follow on base.  Right away, this is a problem for plaintiffs, who need the contract to incorporate state motor vehicle law and to obligate enforcement against third parties.  Moreover, Attachment D discusses rules on base and describes the Provost Marshal's authority to enforce laws, issue personnel directives, and conduct searches and vehicle inspections.  *Id.* at 75–76.  A discussion of curfew hours, for instance, does not establish rights against the government.  *See id.* at 77.  Attachment D is not a promise to enforce laws against third parties.  It puts *the contractor* on notice as to what to expect on base and ensures the contract will not hinder law enforcement.  Nothing in this section expands the Concessionaires' rights or take away the Agency's prosecutorial discretion.

After all, defendant here has three distinct roles: government actor, property owner, and contracting party.  Plaintiffs believe that defendant's role as a government actor means that it has a contractual duty to enforce all laws at all times.  It does not.  If the Agency or the Base has an obligation to enforce the law, this obligation is not contractual.  The mere mention of law enforcement powers does not imply a contractual duty to enforce the law against third parties.

To the extent the Concessionaires may have a claim related to the Agency permitting SeaBreeze's behavior, this claim must rest on actions to the detriment of the Concessionaires: not on general legal obligations.  SeaBreeze's behavior, legal or illegal, must have interfered with the Concessionaires' reasonable expectation under the contract.  And something more than Agency passivity will be required.

The Court, thus, **GRANTS** defendant's motion to dismiss the breach of contract claim. The concessionaire contract never guaranteed any form of exclusivity, so plaintiffs' allegations cannot constitute breach of contract. And plaintiffs have not alleged sufficient facts to establish an implied-in-fact contract.

### ii. Plaintiffs' Good Faith and Fair Dealing Claim

Plaintiffs also maintain that the government's actions violated the duty of good faith and fair dealing. They may be correct.

The duty, implied in every contract, obligates each party not to prevent the other from performing and not to interfere with that party's reasonable expectations of gain from the contract. *Centex*, 395 F.3d at 1304. Plaintiffs allege only that the second was violated.

Plaintiffs aver, in support of this claim, that this case is analogous to *Centex*. Pls.' Opp'n at 34–35. In *Centex*, healthy financial institutions acquired failing thrifts in transactions assisted by the Federal Savings and Loan Insurance Corporation (FSLIC) and the Federal Home Loan Bank Board (FHLBB). *See Centex*, 395 F.3d at 1289. Under the contracts, this assistance reimbursed the acquiring institutions for the difference between the "book basis of the covered assets and the value of those assets when they were sold or written down." *Id.* at 1288. Part of the inducement to enter the contracts, as the RFP and the contracts both noted, was that the FSLIC's reimbursement of losses upon disposal was not taxable, and, nonetheless, the losses were deductible. *See id.* That is, built-in losses provided a tax benefit without a corresponding economic loss for the acquiring institutions.

Congress later amended the tax code, requiring the institutions to "take[] into account" the reimbursements in calculating losses. *Id.* at 1289. Consequently, they no longer could gain a tax advantage from reimbursed built-in loss. The Federal Circuit held that the acquiring institutions were entitled to the monetary value of the deductions under the duty of good faith and fair dealing. *Id.* at 1314. These tax benefits formed part of the consideration under the contract. Indeed, the contracts required the financial institutions to "maximize any tax benefits," *id.* at 1290, and to split these tax savings 50-50 with the FSLIC, *id.* at 1313. Taking away the benefits deprived the financial institutions of their reasonably-expected gains from performance, and thus violated the duty by recapturing their gains for the government. Pls.' Opp'n at 35.

Plaintiffs claim that this case is similar. Here, the government, by allowing SeaBreeze to operate and to compete unfairly in the Concessionaires' operational space, took the gains the Concessionaires hoped to capture from the contract and reappropriated them to SeaBreeze in violation of the duty. *Id.*

The government reminds the Court that the duty of good faith and fair dealing does not change the allocation of burdens and benefits established by the contract. Def.'s Mot. at 22; *see Dobyns*, 915 F.3d at 739. Rather, it polices the outer bounds of the contract by stopping parties from frustrating the promises made in the contract. The duty must key to specific contractual provisions. *Id.* 739–40. Because the contract does not promise exclusivity, the government contends that it contains no provision that can be undermined by allowing others to service the Base. Def.'s Mot. at 23.

The Court holds that plaintiffs' claim of a breach of the duty of good faith and fair dealing cannot be dismissed at this stage, as to alleged events occurring during the years of the written contract. The Agency's actions and inactions in regard to the Concessionaires' competitors and the Holiday Excursion, for instance, plausibly make out a breach of this duty.

Although the Court concludes, as explained below, that the Concessionaires have plausibly alleged a violation of the duty, it is not illuminated by any supposed similarity to *Centex*. In that case, the deduction was part of the consideration. *Centex*, 395 F.3d at 1288, 1304–05. The violation tied directly to a specific contractual promise. But here, there was no reasonable expectation of exclusivity and so no benefit to be reappropriated by permitting SeaBreeze to operate.

But the Concessionaires were due benefits, not nothing at all. Contractors enter into concession contracts to gain access to a market on terms that inspired them to pay for entry. *See generally Frazier v. United States*, 67 Fed. Cl. 56, 58 (2005) (Wolski, J.). In this case, the contract expressly promised coordination as a benefit. Thus, two promises induced plaintiffs to enter the contract and pay the commission---that they could offer its services on favorable, or at least equal, terms, and that the Agency would coordinate with them. These two promises interact. Coordination serves to protect plaintiffs' ability to operate on favorable or equal terms by enlisting the government as a partner. The government could coordinate with others too. The contract promised no exclusivity. But it could not coordinate with others to the Concessionaires' detriment without thereby depriving plaintiffs of the reasonable fruits of the contract. That is, the government could not decide, with SeaBreeze, to make it harder for plaintiffs to conduct business. And the Concessionaires have plausibly alleged this.

Consider the Holiday Excursion. *See* Compl. ¶ 34. Plaintiffs stress that Liberty had the right to provide transportation for excursions during Christmas and other holidays. *Id.* The Court does not believe that this right was exclusive. Rather, it simply meant that, if people on base wished to use Liberty for transportation, they could. This right itself was not breached. But when Liberty inquired as to why so many passengers preferred its competitor SeaBreeze, Liberty was told that the officer responsible (Michael C. Dittamo) "didn't recognize [the] contract." *Id.* The contract, inexplicably not recognized, promised coordination. An

officer who does not acknowledge the contract's existence cannot possibly coordinate.

Even so, Liberty was booked to carry some travelers and received a schedule showing when to pick these passengers up. Yet, plaintiffs allege, non-commissioned officers intentionally released those scheduled to travel with Liberty early, so that these passengers were gone before Liberty even arrived. *Id.* Of course, Liberty had no right to demand that the officers not release their men. But Liberty, unlike its competitors, had a contractual right to coordination. And the officers' actions plausibly constitute lack of coordination. Worse, these actions could spell out a case for false coordination---working together to set times, only to then undermine those times. Indeed, plaintiffs allege that at least one non-commissioned officer was bribed to divert passengers to SeaBreeze. Compl. ¶ 44. And some non-commissioner officers putatively worked as SeaBreeze drivers. Pl.'s 2d. Supp. Br. at 19. The Holiday Excursion passengers, sure enough, traveled with SeaBreeze. *Id.* ¶ 34. Whether by lack of coordination or by false coordination, Liberty lost the reasonably expected value of coordination.

The government responds that Liberty has no right to pick up personnel at any specific place and time for the Holiday Excursion. Def.'s Mot. at 19. True, but irrelevant. The government either failed to coordinate with Liberty or coordinated and then behaved in a manner that benefitted its competitors at its expense. Coordination reveals information. The government knew when Liberty planned to pick up its fares. This information allowed the government to release passengers early and push them onto SeaBreeze vehicles. At least, that has been plausibly alleged.

Likewise, plaintiffs allege that SeaBreeze drivers used their vehicles to physically block the Concessionaires' vehicles from the loading zone. Compl. ¶ 34. This zone was not exclusive. Nonetheless, the Concessionaires had a right to use the zone, without fear of torts by others. The torts themselves, of course, cannot be attributed to the United States. But the obligation to prevent them could be, as part of a responsibility to coordinate.

This points to the larger issue of defendant's three roles: as a government entity, a property owner, and a counterparty on the contract. These are separate roles. Plaintiffs can insist on payment for the government's failure to perform its contractual duties in its role as property owner, regardless of what it was obligated to do in its government role.

In its roles as property owner and contracting party, the government had to supply adequate security to prevent SeaBreeze from committing intentional torts against the Concessionaires. At the bare minimum, the Concessionaires reasonably could expect that level of coordination. Plaintiffs would be unreasonable to think that the contract entitled them to exclusivity, or to profit, or even to any customers.

Why, then, did they enter the contract? To gain coordination from the government, above all else. As in *Centex*, this contract specifically envisions coordination. The Concessionaires expected that the government, as the owner of the property where the shuttle services occurred, would enable the Concessionaires to compete on at least an equal footing with others. Plaintiffs paid to be free from illegal anti-competitive actions by SeaBreeze and similar rivals. Thus, although this Court cannot accept plaintiffs' breach theory, the Court will countenance a violation of the duty of good faith and fair dealing.

Other factual allegations also might constitute a violation of good faith. Supposedly, plaintiffs pressed their contracting officer to remove SeaBreeze's equipment---that is, fixtures and furniture---from plaintiffs' designated operational space. *See* Compl. ¶ 30. No action was taken. What is the value of the coordination if the Agency refused to investigate and response to complaints? Eventually, the evidence may show that the Agency did investigate and, if necessary, responded. But the Concessionaires plausibly allege that they were ignored, leaving that factual question for another day.

Likewise, plaintiffs allege that competitors told passengers they were not allowed to use the Concessionaires' shuttle vans and taxicabs; re-directed passengers to SeaBreeze instead; falsely claimed that American Ground and Liberty did not have a proper license or contract to pick up on base; verbally maligned the Concessionaires; intimidated drivers and prospective fares; physically accosted or harassed the Concessionaires' employees; and wrote false anonymous reports about wrongdoing by the Concessionaires. Compl. ¶ 33.

That is a lot. Certainly, none of this asserts a wrongful act by the government. Nor does any of it assert that SeaBreeze or anyone else committed a tort while acting as an agent of the government. Nor can any of this breach the contract. But these facts do plausibly show that the government failed to prevent SeaBreeze from attempting to monopolize base business with lies and intimidation. The Concessionaires reasonably may have expected that the government (as the owner of the property and counterparty on the contract) would maintain a fair market. Equal footing entails such a market. Coordination may include, at least, responding to complaints when received. *Cf. id.* ¶¶ 35–36 (noting these acts were reported). Putatively, the government disciplined American Ground and Liberty for these events instead. *Id.* ¶ 39.

The government protests that the Concessionaires offer no facts supporting the conclusion that the government allowed, enabled, or acquiesced in SeaBreeze's conduct. Def.'s Mot. at 6. But because the government is the property owner, it arguably acquiesced to all of SeaBreeze's conduct. Military bases, after all, are tightly controlled. And the Concessionaires' ban from the Base in 2017, as well as the loss of its RapidGate passes, demonstrates that the government had the ability

to keep out rogue bus drivers. If SeaBreeze committed these torts and the Agency knew of them, then the government may have allowed them to happen.

Therefore, the Court **DENIES** defendant's motion to dismiss plaintiffs' good faith and fair dealing claim.[3]

### iii. Plaintiffs' Remaining Claims

The government also moved to dismiss the case pursuant to RCFC 12(b)(1), noting that the Court does not possess subject-matter jurisdiction over tort claims or claims against private parties. Def.'s Mot. at 12, 24–25. This is true. *See United States v. King*, 395 U.S. 1, 4 (1969) (private parties); *Awad v. United States*, 301 F.3d 1367, 1372 (Fed. Cir. 2002) (torts). But the case is against the United States, so there are no private parties for the Court to dismiss.

As for the claims presented, the first is for breach of an express contract. Compl. ¶¶ 51–53. The second claim is for breach of the implied covenant of good faith and fair dealing. *Id.* ¶¶ 55–57. Both of these are contract claims.

The third claim, however, seeks damages for intentional interference with prospective economic relations. *Id.* ¶¶ 59–62. Plaintiffs suggest that the United States deliberately interfered with the contract between the Agency and the Concessionaires. *See id.* ¶¶ 59–60. This is nonsensical. Contracts with the Agency are contracts with the government, so the government cannot interfere with itself. Furthermore, if the United States were somehow not a party to the contract, then this Court would lack jurisdiction. Regardless, interference with prospective economic relations sounds in tort. This Court may only hear tort claims when they arise entirely in contract: that is, when the violated duty stems from contract. *See Wood v. United States*, 961 F.2d 195, 198 (Fed. Cir. 1992); *Kenny Orthopedic, LLC v. United States*, 83 Fed. Cl. 35, 46 (2009).

Although the Concessionaires allege that the actions here were wrongful because of contractual obligations, they do not contend that the supposed misconduct was committed by a party to the contract. Rather, plaintiffs argue that an outsider to the contract (the United States) interfered, somehow, with its own contract. And they never contend that the torts violated a duty that exists only through the contract. Thus, the Court lacks jurisdiction over this tort claim, and it is therefore dismissed. To the extent this claim is really about breach or unmet contractual expectations, it is better cognized under the claims for the breach of contract and the breach of the duty of good faith and fair dealing.

---

[3] The Concessionaires have alleged sufficient facts that, if proven true, could convince a factfinder that the government violated its duty of good faith and fair dealing. Also any damages plaintiffs might collect on this claim remain subject to proof as to amount.

The same if true of the fourth claim, for negligent interference with prospective economic relations. Compl. ¶¶ 64–66. This count sounds in tort and must be dismissed.

The fifth claim, for negligence, *id.* ¶¶ 68–69, also sounds in tort. Because none of the factual allegations related to this claim tie it to a contractual duty, the claim is dismissed.

Because the third, fourth, and fifth claims all allege torts outside this Court' subject-matter jurisdiction, the Court **GRANTS** defendant's motion to dismiss these three claims.

### iv. Plaintiffs' Motion to Strike the Scott Declaration

Plaintiffs have moved to strike the declaration of Mr. Richard A. Scott (one of the government's witnesses) on evidentiary grounds, lest the Court consider this exhibit in ruling on the government's RCFC 12(b) motions. *See* Pls.' Reply. Plaintiffs, however, are unable to show any prejudice or confusion at this stage of the litigation. When considering whether to grant a motion to dismiss a case for lack of subject-matter jurisdiction, this Court generally accepts as true all factual allegations the non-movant made and draws all reasonable inferences in the light most favorable to that party. *See Scheuer,* 416 U.S. at 236; *Pixton,* 291 F.3d at 1326; *CBY Design Builders,* 105 Fed. Cl. at 325.

Here, defendant presented the Scott Declaration in response to the Court's request for an explanation of why two different versions of the text of the non-exclusivity clause appeared in the original pleadings. Therefore, for purposes of this 12(b) motion, the Court accepts all plaintiff's factual allegations as true. As a result, the Court must use the version of the clause that plaintiffs offered, as discussed above, although it appears that there is no material difference between the two. In fact, the government has now conceded that plaintiffs' version is accurate. Def.'s Supp. Br. at 16–17.

As a result, the Concessionaires cannot show prejudice from the inclusion of the Scott Declaration. The declaration is simply irrelevant at this stage. Therefore, the Court **DENIES** the motion to strike.

### III.   CONCLUSION

For the above stated reasons, the following is hereby ordered:

1. Defendant's motion to dismiss Plaintiffs' claims for breach of contract including implied-in-fact contract, intentional interference with prospective economic relations, negligent interference with prospective economic relations, and negligence is **GRANTED**.

- 20 -

2. Defendant's motion to dismiss Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing is **DENIED**. Plaintiffs have alleged facts that plausibly constitute a breach of the implied covenant. The amount of plaintiffs' damages, if any, is subject to proof.

3. Plaintiffs' motion to strike the Scott Declaration is **DENIED**.

The Clerk is directed to enter judgment accordingly.   No costs.

It is so **ORDERED.**

s/ Bohdan A. Futey
**Bohdan A. Futey**
**Senior Judge**
